**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**ANGELA LAZELLE TOWNSEND,**

     **Plaintiff,**

**vs.**                   **CIVIL ACTION NO. 1:18-CV-00328**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security dying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered January 23, 2019 (ECF No. 20), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court is Plaintiff's Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment (ECF Nos. 14, 15), and Defendant's Brief in Support of Defendant's Decision. (ECF No. 19)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's motion for summary judgment (ECF No. 14), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 19); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court for the reasons stated *infra*.

1

**Procedural History**

The Plaintiff, Angela Lazelle Townsend (hereinafter referred to as "Claimant"), protectively filed her applications for Title II benefits on November 17, 2014 (Tr. at 280-286) and for Title XVI benefits on December 12, 2014 (Tr. at 289-294) alleging disability beginning September 15, 2014[1] (Tr. at 287-288) due to "diabetes, swelling, fluid retention, nerve pain, acid reflux, arthritis, high cholesterol, migraines, anxiety, life threatening necrotizing bacterial infection, blood clotting in both legs, [and] unable to stand or walk long due to blood clots and pain." (Tr. at 309)[2] Her claims were initially denied on March 27, 2015 (Tr. at 177-182) and again upon reconsideration on June 15, 2015. (Tr. at 184-186, 187-189) Thereafter, Claimant filed a written request for hearing on June 29, 2015. (Tr. at 190-191)

An administrative hearing was held on February 6, 2017 before the Honorable Gina Pesaresi, Administrative Law Judge ("ALJ"). (Tr. at 77-118) On March 1, 2017, the ALJ entered an unfavorable decision. (Tr. at 56-76) On April 17, 2017, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 273-274) The ALJ's decision became the final decision of the Commissioner on January 16, 2018 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On February 19, 2018, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) Defendant (hereinafter referred to as "the Commissioner") filed an Answer and a Transcript of the Administrative

---

[1] Claimant amended her alleged onset date on November 17, 2014, previously, in her application for DIB benefits, she alleged she became disabled on September 21, 2014.

[2] In her Disability Report – Appeal, at the initial level of review, Claimant alleged that since January 2015, she had "lower stomach pain, feeling numb in big toe on right foot. Pain in wrist on right hand." (Tr. at 332) Since March 2015, she began having "sharp pain [and] cramps to my lower stomach" and "fibroid cysts where fixed also 2/2015." (Id.)

Proceedings. (ECF Nos. 9, 10) Subsequently, Claimant filed a Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment (ECF Nos. 14, 15), and in response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 19) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was thirty-six years old as of the alleged onset date and would be defined as a "younger person" throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 69) Claimant has a high school diploma, an Associate's degree in applied science, and also had vocational training which included a two-year apprenticeship in childcare management, child daycare management, and as a teacher's aide. (Tr. at 82-83) From April 1, 1999 through September 2014, she worked as a relief childcare worker. (Tr. at 82, 84) Her duties included administering medication, answering the phone, monitoring 15-minute bed checks, cooking, washing, breaking up fights if necessary, monitoring visits between parents and children in State custody, as well as providing transportation for court, doctor's appointments, or school. (Tr. at 83-84)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any

step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the

impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those

sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional
> limitations is a complex and highly individualized process that requires us to
> consider multiple issues and all relevant evidence to obtain a longitudinal picture
> of your overall degree of functional limitation. We will consider all relevant and
> available clinical signs and laboratory findings, the effects of your symptoms, and
> how your functioning may be affected by factors including, but not limited to,
> chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent
> to which your impairment(s) interferes with your ability to function independently,
> appropriately, effectively, and on a sustained basis. Thus, we will consider such
> factors as the quality and level of your overall functional performance, any episodic
> limitations, the amount of supervision or assistance you require, and the settings in
> which you are able to function. See 12.00C through 12.00H of the Listing of
> Impairments in appendix 1 to this subpart for more information about the factors
> we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the
> degree of your functional limitation: Understand, remember, or apply information;
> interact with others; concentrate, persist, or maintain pace; and adapt or manage
> oneself. See 12.00E of the Listings of Impairments in appendix 1 to this subpart.
>
> (4) When we rate the degree of limitation in the first three functional areas
> (understand, remember, or apply information; interact with others; concentrate,
> persist, or maintain pace; and adapt or manage oneself), we will use the following
> five-point scale: None, mild, moderate, marked, and extreme. The last point on the
> scale represents a degree of limitation that is incompatible with the ability to do any
> gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA

determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s)

is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability

to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's

impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe

impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate

listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental

disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a

severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2018. (Tr. at 61, Finding No. 1) The ALJ then determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since September 15, 2010, the alleged onset date. (Id., Finding No. 2) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: insulin dependent diabetes mellitus (IDDM); deep vein thrombosis (DVT); status-post skin graft after methicillin-resistant staphylococcus aureus (MRSA) infection in leg; depression; and anxiety. (Id., Finding No. 3) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 63, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform sedentary work

> except she can lift or carry 20 pounds occasionally, 10 pounds frequently; sit six hours in an eight-hour day, stand or walk two hours in an 8-hour day; occasionally

climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch and crawl.

(Tr. at 65, Finding No. 5)

At step four, the ALJ found that Claimant was not capable of performing her past relevant work. (Tr. at 69, Finding No. 6) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills, Claimant's age, education, and RFC indicated that there were jobs that exist in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability since September 14, 2014 through the date of the decision. (Tr. at 71, Finding No. 11)

**<u>Claimant's Challenges to the Commissioner's Decision</u>**

As for her first alleged ground of error, Claimant asserts that the ALJ improperly discounted the psychological consultant's opinion that Claimant had impairments in her concentration. (ECF No. 15 at 13) The ALJ also disregarded the opinions of two State agency consultants, who also opined that Claimant had moderate difficulties in maintaining concentration, persistence and pace. (Id.) Instead, the ALJ merely pointed to a list of Claimant's activities in support of her finding she had no impairment in concentration, which ignores the examination or insight into the quality of performing those tasks; the ALJ rejected the opinions of three professionals and simply inserted her own non-expert opinion. (Id. at 13-14)

Next, Claimant complains that the ALJ's credibility analysis is a essentially form over substance and fails to comport with SSR 16-3p. (Id. at 14-15)

Finally, Claimant argues that the ALJ failed to consider the side effects of her medications on her functional capabilities; Claimant testified that her medications made her drowsy and that she took frequent naps during the day. (Id. at 15) SSR 16-3p specifically recognizes that

medication side effects is one of the factors to be considered in evaluating a claimant's symptoms. (Id.)

Claimant asks this Court to reverse the final decision and award her benefits, or alternatively, remand for further proceedings. (Id. at 16)

In response, the Commissioner argues that the ALJ is the sole determiner of a claimant's RFC, and is not required to seek a separate medical opinion in making such a determination. (ECF No. 19 at 9) Further, the ALJ may rely upon the record as a whole to make such determinations, which includes a claimant's admitted activities. (Id.) In this case, the ALJ noted the opinions of the psychological consultants, and reconciled them with the inconsistent other evidence of record, namely Claimant's daily activities of managing finances, paying bills, using a checkbook, handling a savings account, maintaining her medication regimen, reading, and driving. (Id.) Because of Claimant's own admitted activities, the ALJ reasonably found them inconsistent with the psychological opinions of record and properly discounted them to the extent they found moderate limitations in Claimant's concentration, persistence, or pace. (Id. at 9-10)

The Commissioner also contends that the ALJ's credibility analysis complies with SSR 16-3p, finding that Claimant's alleged symptoms were not entirely consistent with the medical and other evidence of record, which included Claimant's admitted daily activities. (Id. at 10-11) With regard to the side effects of her medication, the Commissioner points out that Claimant's statements in her disability application and the objective clinical evidence from her care providers show that she almost consistently reported doing fine on her medication and medical records did not document any complaints of side effects. (Id. at 11-12) In short, the objective evidence is inconsistent with Claimant's subjective symptoms of drowsiness resulting from her medications.

(Id. at 12)

The Commissioner asks that the final decision be affirmed because it is supported by substantial evidence. (Id.)

### The Relevant Evidence of Record[3]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Princeton Community Hospital:

On October 6, 2014, Claimant presented to Princeton Community Hospital due to redness, swelling, and pain of her right thigh following the rupture of a boil. (Tr. at 373-380) An ultrasound revealed deep vein thrombosis (DVT) in the peroneal vein of Claimant's right leg and sepsis. (Tr. at 375) A CT scan of her right thigh revealed necrotizing fasciitis. (Tr. at 375, 377-380) Because of this diagnosis, Douglas R. Smith, P.A.C., a critical care physicians assistant, ordered Claimant transferred to Carilion Clinic. (Tr. at 375)

Carilion Clinic

Claimant was hospitalized at Carilion Clinic from October 7 through November 17, 2014 for necrotizing fasciitis, sepsis, and deep vein thrombosis. (Tr. at 381-888) Diagnosis and treatment included extensive treatment for necrotizing fasciitis, MRSA, Fournier's gangrene, septic shock, kidney disease and metabolic acidosis. (Tr. at 395-396, 398, 406) Claimant also underwent extensive excision and debridement followed by skin grafting. (Tr. at 390-480) Claimant also received treatment for diabetes, having been started on insulin, and for deep vein thrombosis, she received heparin infusions. (Tr. at 589-590)

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

<u>Welch Community Hospital:</u>

On December 9, 2014, Claimant presented to Welch Community Hospital for follow up treatment of her deep venous thrombosis and a wound check. (Tr. at 893) Chandra Sharma, M.D., noted that Claimant's wounds were healing and increased her Coumadin for her deep vein thrombosis because her medication level was sub-therapeutic. (Id.) One week later, Claimant returned for follow-up, it was noted that her right leg was swollen and tender, but Doppler testing indicated no evidence of blood clots. (Tr. at 891) Nonetheless, Dr. Sharma increased her Coumadin again. (Id.)

Claimant returned to Dr. Sharma in March and April 2015 because her Coumadin level was still sub-therapeutic. (Tr. at 945, 938) Dr. Sharma continued to raise Claimant's dosage. (Tr. at 938, 942, 946) On May 8, 2015, Claimant complained of feeling dizzy and Dr. Sharma noticed that she had fluid behind her ear; Dr. Sharma prescribed an antibiotic. (Tr. at 28) In June 2015, Claimant's Coumadin level remained sub-therapeutic. (Tr. at 21, 23, 26)

<u>Key Care Medical Center:</u>

Following discharge from Carilion Center, Claimant sought periodic treatment at KeyCare Medical Center with Andres Rago, M.D. for treatment of diabetes mellitus, anxiety, headaches, as well as follow up from her hospitalization for necrotizing fasciitis, sepsis, and deep vein thrombosis from December 2014[4] through February 2017. (Tr. at 908-913, 926-936, 958-992)

On March 10, 2015, Claimant reported doing fine with her anxiety but did report having a fibroid tumor on her right ovary. (Tr. at 926) She also reported responding well to her medications

---

[4] The record shows that Claimant had been a patient of Dr. Rago's since at least October 2013. (Tr. at 914) In April 2014, she was being treated for depression and anxiety; it was noted that she was doing fine with her current medications. (Tr. at 914)

and no medication side effects were noted. (Tr. at 926-927) Dr. Rago noted grade II pitting edema in the right lower extremity and that Claimant ambulated with a cane. (Tr. at 927)

In May 2015, Claimant once again reported doing fine with her current medications, although she complained that she had been coughing for several days and had an earache. (Tr. at 929) Dr. Rago reviewed her medications for efficacy and side effects and refilled all medications. (Tr. at 931)

On a July 12, 2016 visit, Dr. Rago indicated Claimant continued to have swelling and a limp, favoring the right extremity, and that she occasionally walked with a cane. (Tr. at 959) Claimant reported doing fairly well on her current medications. (Tr. at 958) Dr. Rago again reviewed all of Claimant's medications for efficacy and side effects and refilled them. (Tr. at 960)

On September 10, 2016, Claimant presented with complaints of nausea. (Tr. at 960) Her medication was unchanged and there is no indication of reported medication side effects. (Tr. at 963) Claimant returned to Dr. Rago on September 13, 2016 and reported doing fine with her current medications and only complained of a gynecological problem. (Tr. at 964) Again, Dr. Rago reviewed her medications for efficacy and side effects and refilled them all. (Tr. at 966) On September 20, 2016 it was noted that she ambulates with a cane for support and balance; Dr. Rago indicated that she responded well to her psychotropic medications. (Tr. at 961-962)

On November 10, 2016, Claimant once again reported doing fine with her current medications. (Tr. at 967, 968) Dr. Rago confirmed that she was doing fine with her current medications when reviewing them for efficacy and side effects. (Tr. at 969)

On December 9, 2016, Claimant stated that she was doing fairly well with her current psychotropic medications. (Tr. at 970) It was noted that she ambulated without any assistive

device. (Tr. at 971) Dr. Rago reviewed her medications for efficacy and side effects and renewed Claimant's prescriptions. (Tr. at 972) In January and February 2017, Claimant reported doing fine with her current medications. (Tr. at 973, 976, 979) In a treatment note dated February 3, 2017, it was noted that Claimant exhibited no abnormal gait pattern and ambulated without an assistive device. (Tr. at 980)

    <u>State Agency Medical Consultants:</u>

On February 4, 2015, Rogelio Lim, M.D., reviewed the evidence of record and completed a residual functional capacity assessment. (Tr. at 126-128) Dr. Lim found that Claimant could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk 6 hours during an 8-hour workday, and sit about 6 hours during an 8-hour workday. (Tr. at 126) He also found that she could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; and could occasionally balance, stoop, kneel, crouch, and crawl. (Tr. at 127) Dr. Lim noted that Claimant needed to avoid concentrated exposure to extreme cold or heat, wetness, humidity, vibration, environmental irritants, and hazards. (Tr. at 127-128)

On June 15, 2015, Pedro F. Lo, M.D., upon reconsideration, affirmed Dr. Lim's assessment. (Tr. at 156)

    <u>State Agency Psychological Consultants:</u>

On March 27, 2015, Frank Roman, Ed.D., reviewed the evidence of record and found that Claimant had moderate difficulties maintaining social functioning and moderate difficulties maintaining concentration, persistence, or pace. (Tr. at 125) Dr. Roman noted that Claimant retained the capacity for simple, routine, repetitive tasks in a low pressure setting with minimal change in routine and little decision-making. (Tr. at 129) He further noted that Claimant should

not work in a fast production work setting, should not perform supervisor duties, and should have no more than minimal social interaction in a small group setting. (Id.)

On June 12, 2015, Jeff Harlow, Ph.D., upon reconsideration, affirmed Dr. Roman's mental assessment. (Tr. at 153, 158)

Mental Status Examination:

Teresa Jarrell, M.S., provided a mental status examination of Claimant on March 12, 2015. (Tr. at 918-924) Claimant was cooperative, attentive, and motivated during the examination. (Tr. at 918, 921) While her posture was unremarkable, her gait was mildly slow. (Tr. at 918) She indicated that a friend drove her to the appointment. (Id.) She stated that her problems included anxiety and having only minimal patience. (Tr. at 919)

On examination, Claimant was polite, attentive and cooperative, but her mood mildly anxious and mildly depressed, with a restricted affect at times and sometimes tearful. (Tr. at 921) She was oriented times 4. (Id.) She denied hallucinations, had mildly deficient insight and judgment, and had mildly deficient recent and remote memory. (Id.) Suicidal ideation was not endorsed but homicidal ideation was, but without specific intent or plan. (Id.) It was noted that immediate memory was normal; recent memory was mildly deficient; and remote memory was mildly deficient. (Tr. at 921-922) Her concentration was mildly deficient and mild psychomotor agitation was noted. (Tr. at 922)

Ms. Jarrell noted that Claimant had normal persistence, but mildly slowed pace. (Tr. at 923) She diagnosed Claimant with major depressive disorder, single episode, severe without psychotic features, with anxious distress; generalized anxiety disorder; and somatic symptom disorder. (Tr. at 922) Ms. Jarrell opined that Claimant's worry and anxiety interfered with her

ability to concentrate. (Id.) She opined that prognosis would be guarded with treatment, but poor without. (Tr. at 923)

Ms. Jarrell noted that with regard to her daily activities, Claimant could not test her blood sugar and had her sister do it. (Id.) She also received help from her mother and sister doing her laundry and household chores. (Id.) Claimant's own meal preparations were limited to simple meals in the microwave or eating out. (Id.) She indicated she enjoyed reading and listening to music in free time and watched some television. (Id.) She also stated that she napped often and did not use a computer. (Id.) Ms. Jerrell noted that Claimant did maintain personal hygiene, managed her medication needs, prepares simple foods, keeps her possessions in order, watches television reads and listens to music. (Id.)

With regard to her social functioning, Ms. Jarrell noted that it was primarily limited to contact with close family. (Id.) Claimant indicated that coworkers would check on her from time to time; family members picked up groceries, and her trips outside were primarily limited going to the doctor and pharmacy. (Id.)

Ms. Jerrell opined Claimant would be capable of managing her benefits. (Tr. at 924)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that she stopped working because, "I couldn't – I couldn't – literally could not get up and walk and go." (Tr. at 85) She further testified that at the time she stopped working she had developed an infection from a boil with required surgical intervention and hospitalization to address the infection. (Tr. at 87-88) Her course was further complicated by diabetes, and deep vein thrombosis. (Tr. at 88) She testified that she still has difficulty with the use of her legs following this

illness. (Id.) She testified that these conditions remain unresolved as she has continued problems with swelling in her feet and ankles. (Tr. at 88-89) She testified that her legs are in constant pain from her hips to her toes and starts to bother her as soon as she wakes and gets up in the morning. (Tr. at 90) She testified that being on her feet for more than half an hour was "torture." (Id.) She got relief from this pain by sitting down. (Id.) She also indicated that she typically lies down during the course of the day which helps so long as she can go to sleep. (Tr. at 90-91)

She stated she props her feet up when they are swollen to provide some measure of relief, although the relief was limited. (Tr. at 91) She takes Neurontin and Tramadol which provide some relief "to a certain extent," but she could not take these medications and drive. (Id.) She testified that those medications had side effects, primarily drowsiness which is exacerbated with her diabetic condition. (Tr. at 92)

In discussing her diabetes, Claimant indicated she had been diagnosed as diabetic sometime in the 90's. (Id.) She is insulin-dependent, and she also takes three tablets of Metformin a day. (Tr. at 93) She testified that the combination of insulin and Metformin had her diabetes under control, as of the time of the hearing. (Id.) However, she also testified that she had had her AlC checked three days prior, which had caused her insulin requirement to be "upped." (Id.)

When asked about her ability to sit, Claimant explained that "it depends on how long and what type chair or whatever I'm sitting on." (Tr. at 94) Claimant testified that she was uncomfortable sitting during the hearing, noting that it had been going on approximately 20 to 25 minutes, and that "if I didn't have to sit here and talk to you guys, I would've gotten up a long time ago." (Id.) She indicated that until recently, sitting in the recliner had been a better position for her, but it now bothers her back. (Tr. at 95)

Claimant testified she lived in Welch with her mother, who was 76 years of age. (Id.) She indicated that she and her mother split household duties. (Id.) However, Claimant described her execution of those duties as "I do what I can do or feel like doing and I just stop." (Tr. at 95-96) When asked how her approach varied from the norm, she indicated "I don't do it as fast and I don't generally do anything without breaks." (Tr. at 96) She will generally work within 10 to 15-minute increments. (Id.) She testified that if it's something that she cannot get done and that is important she asked her mother to finish it, or she will come back to it later. (Tr. at 96-97)

Claimant testified that some days she just does not do anything and finds it hard to do any kind of activity. (Tr. at 97) She explained, for example, that the week of the hearing she had not done anything except go to the doctor because she was feeling weak and dizzy. (Id.) She also testified she has vision problems which she attributed to her diabetes and astigmatism. (Id.) She testified she had blurred vision at times and has a history of migraines, which is controlled by medication sometimes, but it also requires her to try to lay down to address the symptoms. (Tr. at 97-98)

She testified that she still gets the migraine headaches from time to time even though she was taking medication, but that there may be weeks in between those episodes. (Tr. at 98) The episodes typically will last a couple of hours during which time she lays down and tries to avoid light or sound, both of which bother her. (Tr. at 98-99)

She testified she takes Lexapro and lorazepam for anxiety and depression. (Tr. at 100-101) She indicated that her anxiety appeared to begin with her serious illness, and the anxiety is most significant when she has to have some kind of medical procedure. (Tr. at 101) In her day-to-day functioning she indicated that she experiences those symptoms at times when shopping or similar

activities, which cause a sense of dread. (Id.)

She testified that her depression significantly stems from the episode of her severe illness, and the limitations that she has had since that time. (Tr. at 101-102) She testified that her depression impacts how she relates to others, and that she isolates herself during those episodes. (Tr. at 102) She explained that she listens to music when she's upset, and that she sometimes goes to church when she feels like it, stating that it was like "therapy" for her. (Tr. at 102-103)

Claimant testified as to her day-to-day functioning as "just whatever I need to do to basically live, I do it during the day and at my own pace-or not at all." (Tr. at 103) She further testified that her "not at all" days occurred 1 to 2 days a week typically. (Id.)

Claimant testified that she had driven to the hearing that morning, that the trip was approximately 45 minutes, and that she had traveled without stopping. (Tr. at 104) However, she stated that when she returned home that day after the drive to and from, that she would be "ready to go to bed." (Tr. at 105) Claimant testified that she believed it would be difficult for her to manage an 8-hour work day, 5 days a week because she would need a nap at some point during the day typically and she did not anticipate that would be accommodated by any employer. (Tr. at 105-106) She also testified that this was significantly and dramatically different from how she used to function. (Tr. at 106)

Claimant testified that she used a cane when she had episodes with her back, or if her legs were bothering her; she left the cane in her car during the hearing. (Tr. at 106) She stated that she had used it during the entire prior week. (Id.)

Cecilia Thomas, Vocational Expert ("VE") Testimony:

In response to a hypothetical individual of Claimant's age with her same education and

work experience who could lift or carry 20 pounds occasionally and 10 pounds frequently; sit 6 hours during an 8-hour workday and stand and walk 2 hours during an 8-hour workday; never climb ladders, rope, or scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; and have only occasional interaction with supervisors, coworkers, and the public, the VE testified that such an individual could perform unskilled work as a document preparation worker, surveillance system monitor, and non-postal mailroom clerk. (Tr. at 109-113)

The VE testified that if the hypothetical individual were to be absent two to three times a month due to physical limitations or to medical appointments, then no jobs available for the individual to perform. (Tr. at 113-114) The VE further testified that there would be no jobs that would allow an accommodation that would permit the worker to lay down during the course of the workday as needed. (Tr. at 115) The VE also acknowledged that if the hypothetical individual was unable to complete an eight-hour workday consistently, then the individual could perform none of the jobs identified. (Id.)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner

is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

Claimant argues that the ALJ improperly discounted the opinion evidence of three medical professionals concerning her limitations in concentration, and instead, inserted her own non-expert opinion in finding that Claimant had no limitations whatsoever in her ability to concentrate. (ECF No. 15 at 13-14)

Evaluating Opinion Evidence:

20 C.F.R. §§ 404.1527, 416.927 governs the SSA's criteria for evaluating opinion evidence; per §§ 404.1527(a)(1), 416.927(a)(1):

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of examination; (2) Nature and extent of the treatment relationship; (3) Supportability; (4) Consistency; (5) Specialization; and (6) various other factors. Under §§ 404.1527(c)(1) and 416.927(c)(1), more weight is given to a physician who examines a claimant than to a non-examining physician. It is the responsibility of

the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

Here, the ALJ found Claimant had no limitations in concentrating, persisting, or maintaining pace.[5] (Tr. at 64) The ALJ explained "[i]n this regard, [Claimant] noted on Function Report forms that she is able to drive, pay bills, count change, handle a savings account, use a checkbook or money order, read and watch television." (Tr. at 64, 323-330, 341-348, 341-353) The ALJ considered the opinion evidence, acknowledging that both Drs. Roman and Harlow were State agency consultants and non-examining sources, and noting their opinions that the record showed Claimant had moderate difficulties in maintaining concentration, persistence and pace. (Tr. at 64-65) The ALJ gave these opinions "little weight," and determined that "their findings are not fully consistent with the record" and that "the collective record does not support moderate limitations in concentration, persistence or pace." (Tr. at 65) The ALJ explained that the "[d]uring consultative examination, the claimant's concentration and pace were mildly deficient and her persistence was normal." (Tr. at 65, 918-925) Further, the ALJ noted that Claimant "testified or indicated that she still drives, manages finances, cooks, reads, watches television, manages medications, maintains medical appointments, attends church, and keeps her possessions in order." (Tr. at 65) Based on this evidence, the ALJ found "the consultants findings were not fully supported." (Id.)

---

[5] The ALJ also found no limitations in Claimant's abilities in understanding, remembering, or applying information or in adapting or managing oneself; she did find moderate limitations in Claimant's abilities in interacting with others. (Tr. at 64)

The ALJ considered Ms. Jarrell's opinion as well, noting that she evaluated Claimant on March 12, 2015 as part of her application process. (Tr. at 67) Additionally, the ALJ noted Ms. Jarrell's observations of Claimant during the examination as well her findings, *supra*. (Tr. at 67) The ALJ specifically considered Ms. Jarrell's finding that Claimant's "anxiety interfered with her ability to concentrate." (Tr. at 69, 922) The ALJ explicitly stated that although she afforded "significant weight" to the examiner's diagnoses and findings from the mental status examination, she found the "opinion on interference with concentration is not supported by the totality of the evidence, which I find more persuasive." (Id.) Again, the ALJ referred to Claimant's ability to drive, noting that she drove 45 minutes to the hearing, and that she can maintain her household, manage finances[6], pay bills, use a checking and savings account, attend church and medical appointments, maintain her medication regimen, reads and watches television, and that these activities do "not establish impaired concentration." (Tr. at 69)

The ALJ's discussion of the opinion evidence with the other evidence of record shows that the ALJ gave a thorough consideration of the consultants' opinions and compared their findings to the other evidence of record, which is clearly the intent of the pertinent Regulations, *supra*. For instance, the ALJ noted that although Drs. Roman and Harlow found Claimant to have moderate limitations in maintaining concentration, persistence and pace, Ms. Jarrell found Claimant's concentration to be mildly deficient (Tr. at 922), her persistence within normal limits and her pace to be mildly deficient (Tr. at 923). (Tr. at 65) Moreover, there is no evidence that the ALJ outright rejected these opinions and supplanted her own lay opinion, for instance, it is noteworthy that the ALJ acknowledged Ms. Jarrell's assessment that Claimant demonstrated "overall mild deficits in

---

[6] Ms. Jarrell also opined that Claimant would be capable of managing benefits if awarded. (Tr. at 924)

social functioning." (Tr. at 67) However, the ALJ herself found Claimant was more limited in this area, finding Claimant had "moderate limitations" in interacting with others based on her own statements and testimony that she did not like being around people all the time and that she did not interact with others as much as she did previously. (Tr. at 64) However, the ALJ reconciled this with Claimant's other assertions that she can grocery shop, go to the pharmacy, attend medical appointments, attend church, dine out, chat and text with her sister, and that her mother, cousins and friends will check in on her and bring her groceries. (Id.)

As with the other broad areas of functioning, the ALJ considered the findings of both examining and non-examining sources as well as the other evidence of record which included Claimant's own allegations. To the extent that there were conflicts in the evidence, the ALJ evidently reconciled them, which is her exclusive duty. The Court does "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). What Claimant invites this Court to do is essentially re-weigh all this evidence and make a finding that substitutes the judgment of the ALJ which is explicitly prohibited. In sum, it is apparent that the ALJ complied with the pertinent Regulations and controlling law and was therefore entitled to give the weight she deemed appropriate to these opinions. In short, the undersigned **FINDS** that the ALJ's evaluation of the opinion evidence with regard to Claimant's mental impairments was "rational" under the law, and that her evaluation was supported by substantial evidence. Oppenheim, 495 F.2d at 397.

Evaluation of Symptoms in Disability Claims:

Claimant asserts that the ALJ failed to comply with Social Security Ruling 16-3p with

respect to her subjective symptom analysis as it was nothing more than a "recitation" of the medical evidence, and further, the ALJ failed to consider the side effects of Claimant's medications on her daily functioning, particularly where she testified that she takes naps during the day. (ECF No. 15 at 14-15)

Social Security Ruling ("SSR") 16-3p[7] clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 requires a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can reasonably be accepted as consistent with the objective medical evidence and other evidence; that explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs that adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. See, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or

---

[7] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p and therefore governed the ALJ's decision herein. See, SSR 16-3p, 2016 WL 1131509. The new Ruling eliminates the use of the term "credibility" from SSA policy because the Regulations do not use that term: "we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." See, 2016 WL 1119029, at *1.

examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons . . . Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and ***side effects of any medication*** you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

Id. §§ 404.1529(c)(3) and 416.929(c)(3) (emphasis added).

Moreover, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8,

2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.")

Here, the ALJ considered Claimant's testimony as to why she was unable to work, because "she could no longer get up and walk." (Tr. at 66) The ALJ discussed her testimony as it related to her numerous medical issues: the boil that became infected that ultimately required skin graft surgery; the diabetes diagnosis from 1996; related kidney problems; her insulin dependence and Metformin medication; her blurred vision; and her deep vein thrombosis. (Id.) The ALJ also noted that after Claimant's skin graft surgery, she did not return to work because she had pain with standing and she had swelling in her feet and toes; the ALJ acknowledged Claimant had constant pain in her legs and that she sits for relief. (Id.) Although Claimant reported that nothing really helped with her pain, the ALJ noted that Claimant stated Neurontin and Tramadol helped to an extent, but it wears off; she also noted that Claimant take those medications only as needed. (Id.) The ALJ did recognize that Claimant used a cane when she has aches and soreness, and she had it in her car. (Id.) The ALJ noted that Claimant estimated she could stand 5-10 minutes and on some days she does nothing. (Id.) She also noted that Claimant's depression and anxiety sometimes makes it difficult to be around people and that she lives with her 76-year-old mother. (Id.) The ALJ noted that Claimant shares household chores with her mother, although Claimant takes breaks with the housework. (Id.) She acknowledged Claimant listened to music, attends medical appointments and that she goes to church when she feels like going, and that she reported church is like therapy. (Id.) The ALJ mentioned Claimant can cook, do laundry, and does what she needs at her own pace, and that she drove 45 minutes to the hearing without stopping. (Id.)

After properly performing the two-step process, the ALJ proceeded to review the evidence of record and reconciled it with Claimant's statements concerning the intensity, persistence and limiting effects of her symptoms, and found that they "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Id.) The ALJ determined that "despite the claimant's testimony of pain and residual symptoms, the collective record supports she is capable of performing work within the above [RFC]." (Id.)

Next, the ALJ discussed the medical records, first recognizing that "there are no medical records indicating a significant medical event or any treatment on the claimants alleged onset date, Sept 15, 2014." (Id.) The ALJ noted that prior to this date, the records only show that she had a follow-up appointment in April 2014 with her primary treating source, Dr. Rago for routine medication management of [then] non-insulin dependent diabetes mellitus and depressive disorder and that Claimant reported that "she was doing fine on her current medications." (Tr. at 66, 914-915) The ALJ also noted that despite Claimant's allegations of blurred vision, the record showed that "she had not been to see an ophthalmologist since 2010 and at that time her visual acuity was 20/25 in the right eye and 20/50 in the left eye with no mention of diabetic retinopathy." (Tr. at 66, 371-372)

The ALJ noted that the record demonstrated that prior to her hospitalization on October 7, 2014 that she had any related treatment. (Tr. at 66) Claimant's extensive treatment as it related to her infected boil, and subsequent skin graft surgery, resulting kidney issues, MRSA, Fournier's gangrene and sepsis were detailed by the ALJ, including Claimant being started on insulin and Metformin for her diabetes mellitus during her hospitalization, and also heparin infusion for her bilateral deep vein thrombosis (DVT), and her final discharge on November 17, 2014. (Tr. at 66-

67, *supra*) The ALJ noted the follow-up treatment note from December 2014 for Claimant's outpatient wound care and bilateral DVT wherein it was noted she was "doing fairly well", though her anticoagulation therapy of Warfarin was increased due to inadequate prothrombin time/international normalization ration (PT/INR). (Tr. at 67, 889-898)

The ALJ next considered the March 3, 2015 annual female exam note from her treating source that documented she presented in no acute distress, that though she had scarring on her left leg from the skin grafting and extensive grafting of skin to her right groin and right leg, her extremities were negative for edema. (Tr. at 67, 947-948)

Ms. Jarrell's observations and findings were noted, specifically, that Claimant's posture was unremarkable, that her gait was mildly slow, that she drove herself to the examination, that Claimant endorsed feeling depressed every day since her illness, poor sleep, fatigue, loss of interest in activities and other people, irritability, constant worry, that she appeared mildly anxious and had a distressed mood, a restricted affect, and that Claimant displayed psychomotor agitation and tearfulness. (Tr. at 67, 918-925)

The ALJ mentioned Dr. Rago's reports from March and May 2015 which noted that Claimant reported "doing fine" and that her wound healed with no signs of infection; that she received medication management for her diabetes; that Dr. Rago noted Claimant's anxiety and depression disorders but she was "responding well to medications"; and that Dr. Rago observed Claimant had grade II pitting edema of her right lower extremity and she walked with a cane; but her examination was otherwise normal. (Tr. at 67, 927-928)

The ALJ noted that Claimant's PT/INR levels were subtherapeutic in a medical report dated May 8, 2015 (Tr. at 68, 938), and that she had no follow-up care with any source until

27

January 2016. The ALJ acknowledged that Dr. Rago's treatment notes from January through December 2016 indicated that Claimant reported "doing fine with her current medication regimen including psychotropic medications" (Tr. at 68, 964-978) though he added Seroquel to her medication regimen in January 2017. (Tr. at 68, 978) Dr. Rago's observations that Claimant used a cane to ambulate at times were also noted from the record of evidence (Tr. at 68, 959, 962), though the ALJ stated in all other records, there is no mention of her cane use.[8] The AJL also noted that Dr. Rago found that Claimant's hemoglobin A1C levels and blood glucose were elevated in January and February 2017, though Claimant continued to report that she "was doing fine." (Tr. at 68, 973, 985, 986, 991)

Ultimately, the ALJ found Claimant's "subjective symptoms lack consistency with the evidence to the extent that they purport to describe a condition of disability for Social Security purposes." (Tr. at 69) As pointed out by Claimant, the ALJ does not mention her allegations that Neurontin and Tramadol cause her drowsiness where she needed to nap throughout the day, only that she does take those medications only an "as needed" basis and that they helped with her pain to an extent, but then they wore off. (Tr. at 66) The question is whether the ALJ's omission of Claimant's alleged side-effect to her pain medication upends the entire subjective symptoms analysis.

---

[8] Earlier in the written decision, the ALJ noted that Claimant testified that she "occasionally" used a cane, and that this was noted on only three occasions in the record. (Tr. at 63, 927-928, 959, 962) The undersigned notes that although Claimant's cane use is not mentioned in other records, Dr. Rago's treatment notes mention her cane or assistive device use for either ambulation or balance on eight occasions: December 29, 2014 (Tr. at 909); December 1, 2014 (Tr. at 912); March 10, 2015 (Tr. at 927); July 12, 2016 (Tr. at 959); September 20, 2016 (Tr. at 962); November 10, 2016 (Tr. at 968); January 6, 2017 (Tr. at 977); and January 12, 2017 when Dr. Rago also noted that Claimant had "no abnormal gait pattern" (Tr. at 974). Dr. Rago also reported that Claimant used a cane "occasionally" (Tr. at 959, 962) and even reported that Claimant ambulated without an assistive device on December 9, 2016 (Tr. at 971) and February 3, 2017 (Tr. at 980). Nevertheless, because the ALJ observed Claimant did not bring her cane with her during the administrative hearing and there appears to be no dispute that Claimant occasionally uses a cane or assistive device with ambulation or for balancing, the ALJ's miscount is of no moment.

It is noted that "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." See Manigo v. Colvin, 2015 WL 74954, at *5 (D. S.C. Jan. 6, 2015) (quoting Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)). Indeed, "there is no particular language or format that an ALJ must use in his . . . analysis as long as there is sufficient development of the record and explanation of the findings to permit meaningful review." Clark v. Comm'r of Soc. Sec., No. 09–417, 2010 WL 2730622, at *17 (E.D. Va. June 3, 2010) (quoting Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004)). The ALJ's opinion is sufficient if it "not only sets forth the facts used in rendering his decision, but it also provides a thorough examination of the medical evidence." Id.

Given the conflicting evidence consisting of Claimant's allegations of pain and other symptoms with the objective and other evidence of record, the ALJ is solely responsible for resolving the conflict; the issue before the Court is not whether Claimant is disabled, but whether the ALJ's finding is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1995). Aside from not mentioning Claimant's alleged drowsiness from medications that she only takes on as needed basis, the ALJ provided a thorough review that included not only Claimant's testimony and statements from her applications for benefits, but also the objective medical evidence and other evidence of record, which included Claimant's own admitted activities. Frequently throughout the decision, the ALJ cited Claimant's treating primary care provider's treatment notes, wherein Dr. Rago specifically noted that she was doing well on all her medications, and aside from adjusting her diabetes medications occasionally, his treatment notes do not mention side effects from any of Claimant's medications, which included her pain medications, only that his patient reported doing

29

well on her medication regimen. This is significant because Dr. Rago's records indicate that he had been treating Claimant for her ongoing pain symptoms for several years. Additionally, Claimant did not mention that these medications caused drowsiness in her application forms.[9]

Despite the ALJ's not mentioning or specifically discussing the alleged drowsiness caused by Neurontin and Tramadol, it is also significant that the record does not demonstrate functional limitations associated with these alleged side effects, accordingly, there is no reversible error here. See, e.g., McKinney v. Astrue, No. 5:06-cv-00998, 2008 WL 75109, at *18 (S.D.W.Va. March 19, 2008) (J. Johnston). In short, the ALJ provided a fairly thorough and adequate review of Claimant's subjective complaints, reconciled them with the medical and other evidence of record, and ultimately determined that her symptoms did not limit her to the extent alleged.

The undersigned **FINDS** that the ALJ's subjective symptoms analysis complied with the pertinent Regulations and controlling case law and is based upon substantial evidence. The undersigned further **FINDS** the ALJ's discussion of the objective and other evidence of record in her evaluation of Claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms, and that the ALJ's conclusion that Claimant's statements were inconsistent with the evidence of record complied with the applicable law and supported by substantial evidence.

---

[9] In her Disability Report dated December 22, 2014, Claimant asserted that the side effects she experienced from Tramadol were headache, dizziness, and made her lightheaded and that she took one pill every 8 hours. (Tr. at 319) In another Disability Report-Appeals, dated May 11, 2015, Claimant indicated that the side effects from Tramadol were "UNK" (Tr. at 335); in a May 18, 2015 Function Report Claimant alleged that the side effect from Tramadol was constipation (Tr. at 348). In a Pain Questionnaire dated May 19, 2015, Claimant indicated she took Tramadol on an "as needed" basis, and that in addition to her other medications, she listed the collective side effects as dizziness, constipation, stomach pain, and headaches. (Tr. at 350, 351, 352)

Finally, the undersigned further **FINDS** that in light of the ALJ's analysis of the evidence of record, the final decision denying Claimant's applications for benefits is supported by the substantial evidence.

**<u>Recommendations for Disposition</u>**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for summary judgment (ECF No. 14), **GRANT** the Commissioner's request to affirm the decision below (ECF No. 19), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933

(1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: January 31, 2019.

Omar J. Aboulhosn
United States Magistrate Judge